GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
By:    DOMINIKA TARCZYNSKA
         JEAN-DAVID BARNEA
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York  10007
Telephone:  (212) 637-2748/2679
Facsimile:   (212) 637-2686
E-mail: Dominika.Tarczynska@usdoj.gov
        Jean-David.Barnea@usdoj.gov


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA *ex rel.*      :
JOHN DOE,                               :
                                        :      14 Civ. 8991 (JPO)
                      Plaintiff,        :
                                        :
      - against -                       :      Jury Trial Demanded
                                        :
STARGATE APPAREL, INC.,                 :      **FILED UNDER SEAL**
RIVSTAR APPAREL, INC. and               :
JOSEPH BAILEY,                          :
                                        :
                      Defendants.       :
------------------------------------------------------------x

### COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA

The United States of America (the "Government" or the "United States"), by its attorney,

Geoffrey S. Berman, United States Attorney for the Southern District of New York, files this

Complaint-in-Intervention against defendants Stargate Apparel, Inc. ("Stargate"), Rivstar Apparel,

Inc. ("Rivstar"), and Joseph Bailey ("Bailey," and together, "Defendants"), alleging as follows:

### PRELIMINARY STATEMENT

1.     The Government brings this Complaint-In-Intervention seeking damages and civil

penalties against Stargate, Rivstar, and Bailey under the False Claims Act, 31 U.S.C. § 3729 *et*

*seq.*, based on their knowing and fraudulent evasion of millions of dollars of customs duties owed on apparel imported from China.  As part of their scheme to defraud the United States of customs duties, which lasted from at least 2004 through 2015, Defendants employed various fraudulent invoicing methods to deliberately and materially understate the value of their imports to U.S. Customs and Border Protection ("CBP"), a component of the U.S. Department of Homeland Security.  By understating the value of the imported apparel in fabricated invoices, Defendants defrauded the United States out of millions of dollars in customs duties.

JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345.

3.      Venue is appropriate in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and 1391(c) because Defendants are located in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

PARTIES

4.      Plaintiff is the United States of America.

5.      Defendants Stargate and Rivstar, both with their principal place of business in New York, New York, are engaged in the importation of clothing, including from China.  Stargate and Rivstar both maintain offices at 231 West 39th Street, Room 500, New York, NY 10018.

6.      Defendant Bailey is the president of Stargate and Rivstar.  He is also the majority owner of Stargate and Rivstar.

## FACTUAL ALLEGATIONS

### A.  Customs Duties

7.     All merchandise imported into the United States is required to be "entered," unless specifically excepted.  19 C.F.R. § 141.4(a); 19 U.S.C. § 1484.  "Entry" means, among other things, that an importer or its agent must file appropriate documents with an officer of CBP that allow the agency to assess the customs duties due on the merchandise being imported into the United States.  19 C.F.R. § 141.0a(a).

8.     The documents required to be filed with CBP in order to complete entry include: (i) a bill of lading or air waybill; (ii) a commercial invoice; and (iii) an entry summary (CBP Form 7501).  *See, e.g.*, 19 C.F.R. §§ 141.11, 141.19(a), 141.81, 141.86(a), 142.3(a), 142.6(a).

9.     Pursuant to 19 U.S.C. § 1484, the entity serving as "importer of record" is responsible for paying the customs duty and using reasonable care in making and providing accurate documentation to CBP that allows the agency to assess the customs duties due on the merchandise.  19 U.S.C. § 1484(a)(1)(B).

10.     Generally, the importer of record is required to deposit estimated duties with CBP at the time of entry.  19 U.S.C. § 1505; 19 C.F.R. § 141.101.  In most cases, the amount of customs duty owed is equal to the value of the imported merchandise multiplied by the applicable duty rate.

11.     The value or approximate value of the imported merchandise must be declared in the commercial invoice and entry summary.  Federal law provides that every importer of record must file a declaration stating that the values set forth on these documents are accurate.  19 U.S.C. § 1485.

12.     Generally, importers of record are required to declare the "transaction value" of the goods, which is the price actually paid or payable for the merchandise plus, if applicable, certain additional costs incurred with respect to the merchandise.  19 U.S.C. § 1401a(a)(1)(A), (b).

13.     The entry summary form includes a declaration that "the statements in the documents herein filed fully disclose to the best of my knowledge and belief the true prices, values, quantities . . . and are true and correct" and that the declarant "will immediately furnish to the appropriate CBP officer any information showing a different statement of facts."  CBP Form 7501.

14.     Stargate and Rivstar, like many other importers of record, use a customs broker to assist them in clearing goods for entry by preparing the entry summary and other necessary paperwork and calculating taxes and duties.  The customs broker completes the entry summary based on the information, including invoices, provided by the importer of record.

**B. Defendants' Schemes to Defraud the United States**

15.     To avoid the payment of customs duties, Defendants engaged in deliberate schemes to fraudulently underpay customs duties owed to the Government in connection with garments imported into the United States, by making false representations on entry documents filed with CBP about the value of the imported merchandise.

16.     Defendants orchestrated their schemes in two distinct ways.  Although the schemes differed in certain details, in general terms, the schemes functioned as follows:

a.     First, Defendants engaged in a "double-invoicing" scheme pursuant to which they were provided with two sets of invoices by the exporter.  The first invoice reflected the amount Defendants actually paid the exporter for the goods; the second invoice fraudulently reflected a fabricated lower amount and was submitted to CBP during the entry process.  These

two invoices were virtually identical (*i.e.*, they bore the same invoice number, description of goods, quantity of goods, etc.), except that they stated different prices for the same shipments of goods.

      b.     Second, Defendants engaged in a scheme in which exporters provided two invoices to Defendants that *together* reflected the actual price Defendants paid for each shipment of goods.  Defendants would submit only one of the invoices to CBP as part of the entry packet.  The second invoice, which purported to be for "samples," "accessories," "commissions," or "testing costs," but in reality reflected an additional payment made by Defendants for the same goods described in first invoice, was not submitted to CBP.

    17.    The following examples illustrate how the two schemes operated to artificially deflate the value of the imported apparel, and therefore enabled Defendants to avoid paying appropriate customs duties to the United States.  These examples represent only a small fraction of the total number of fraudulent entry records submitted by Defendants to CBP in connection with shipments of goods from overseas.

    **a.  Stargate**

      **i.  Taizhou Jiali Garments Co. Ltd.**

    18.    Beginning in approximately 2007, Stargate purchased the vast majority of the clothing that it sold from Taizhou Jiali Garments Co. Ltd. and its affiliated manufacturers (collectively, "Taizhou"), all of which were located in China.

    19.    Shortly after Stargate began doing business with Taizhou in 2007, Bailey asked Taizhou to provide Stargate with two sets of invoices for each shipment of goods.  One invoice, referred to by Stargate employees as the "pay by" invoice, reflected the (significantly higher) actual price paid by Stargate for the goods.  The second invoice, the "customs" invoice, reflected a significantly lower price for the goods and was the invoice that Stargate presented to CBP.  This

scheme, which lasted through approximately 2010, allowed Stargate to pay a fraudulently lower amount of customs duties for each shipment of goods.

20.     For example, in early January 2008, an employee of Taizhou sent an email to Bailey, seeking payment for a number of invoices (the "Pay By Invoices") in the following amounts:

> JL7280: $286,442.00
>
> JL7285: $227,974.00
>
> JL7289: $97,002.10
>
> JL7290/92/93: $299,314.25
>
> JL7294: $55,681.80

Stargate, at Bailey's direction, paid these amounts primarily by wire transfers from Stargate's bank account in New York to Taizhou's bank account in China.

21.     Shortly thereafter, Taizhou sent Stargate documents identified as "Shipment Documents," including falsified "customs" invoices (the "Falsified Invoices"), for these shipments.  The Falsified Invoices bore the same invoice numbers as the Pay By Invoices for which Taizhou had previously requested payment, but reflected different, lower prices for the goods:

> JL7280: $203,328
>
> JL7285: $21,750
>
> JL7289: $43,394
>
> JL7290/92/93: $184,451
>
> JL7294: $38,923

Stargate presented these Falsified Invoices, and therefore falsely declared the amounts set forth on the Falsified Invoices as the value of the goods, to CBP when entering the goods into the United States.

22.     As another example, in June 2009, Taizhou requested payment for a shipment of 41,410 pieces of girls' clothing by emailing a Pay By invoice, bearing the invoice number JL9267

and in the amount of $199,157.26, to Stargate, which Stargate paid.  Taizhou also emailed a second invoice to Stargate, bearing an identical date and invoice number but reflecting a price of $130,591.12 for the same 41,410 pieces of girls' clothing.  Stargate then, through its customs broker, submitted the second invoice with the lower amount to CBP, and falsely declared the value of the shipment to CBP as being only $130,591.12.

23.   Around 2010 and continuing through at least 2015, at Bailey's direction, Stargate and Taizhou began to engage in a different customs fraud scheme involving invoices purporting to be for "sample" goods.  In this scheme, Taizhou would send two separate sets of invoices for a given shipment that together reflected the true price Stargate actually paid to Taizhou for a particular shipment of clothing.  The first invoice, typically entitled the "commercial invoice," described the goods purchased, and was submitted to CBP.  The second invoice purportedly reflected amounts paid by Stargate for "sample" goods and was not submitted to CBP (importers are not required to pay customs duties on sample goods).  The "samples" invoice was not, in fact, for samples actually purchased by Stargate.  Rather, Stargate used the "samples" invoice to make an additional payment to Taizhou for the goods purchased by Stargate that were described in the "commercial invoice," while hiding the full value of those goods from CBP.  On their face the "sample" invoices state implausibly high unit prices and quantities: For example, the "samples" invoices typically reflected a unit price for sample goods that was significantly greater than the unit price for the same non-sample goods reflected on the "commercial" invoices submitted to CBP (for example, $70-$90 per unit on the "samples" invoice versus a $4 per unit price on the "commercial" invoice).  In addition, the "samples" invoice usually reflected the purchase of unusually large amounts of sample goods, for example quantities as large as 24 or 48 pieces of

apparel in a single color and in a single style, which is inconsistent with the legitimate use of samples.

24.     In Stargate's internal accounting program, the company's employees would allocate the amount reflected on the "samples" invoice to the cost of the garments listed on the corresponding "commercial" invoice by entering an additional amount into the "miscellaneous" field in the program.

25.     Bailey knew that the unit price reflected on the commercial invoice was not the true price that Stargate paid to Taizhou for each shipment of goods involved in this scheme.  For example, Bailey's handwriting on a commercial invoice dated June 5, 2014, reflects calculations that he personally performed, adding up the values from the samples invoice and commercial invoice to arrive at the true cost per item, and thus the value, of the imported merchandise.

26.     As an example of this scheme, in October 2013, Taizhou sent an email to Stargate requesting payment of $277,105.20 for a shipment of girls' woven pants and jackets.  Attached to the email were two invoices.   The first invoice, with the file name "JL13076-Oct. 16 (Revised).pdf," was in the amount of $207,427.50; the second, with the file name "JL13076 – Debit Note samples.pdf," was in the amount of $69,677.70.   The invoice in the amount of $207,427.50 was entitled "Commercial Invoice" ("Commercial Invoice-1") and reflected Stargate's purchase of 35,670 pairs of girls' woven pants with a purported unit price of $4.50, and 7,506 girls' woven jackets with a purported unit price of $6.25.   The invoice in the amount of $69,677.70 was entitled "Debit Note Samples" ("Sample Invoice-1") and purported to describe the purchase of 576 samples at unit prices ranging from $75 to $100 per unit.  Sample Invoice-1 did not reflect a purchase of actual samples, but rather was a means for Stargate to make an

additional payment to Taizhou for the goods described in Commercial Invoice-1 without declaring that additional payment to CBP.

27.     On or about October 23, 2013, Bailey authorized and effectuated a wire transfer of $277,105.20—*i.e.*, the sum of the billed amounts reflected in Commercial Invoice-1 and Sample Invoice-1—to Taizhou.   On or about October 27, 2013, Stargate submitted only Commercial Invoice-1 to CBP, and thus falsely declared the value of the shipment to be $207,427.50.

28.     In order to account for the amount it actually paid for the goods in its internal accounting system, Stargate allocated the additional $69,677.70 that it paid for the shipment, as reflected in Sample Invoice-1, to the unit price of the 35,670 pairs of girls' woven pants reflected in Commercial Invoice-1.  More specifically, Stargate added $1.85 per unit to 23,376 pieces, and $2.15 per unit to 12,294 pieces, in the "Miscellaneous" column of its internal accounting software. Together the amounts added in the "Miscellaneous" column totaled the $69,677.70 reflected on Sample Invoice-1

29.     As another example, in April 2014, Stargate paid $157,537.20 to Taizhou for a shipment of girls' pants and shorts.  Stargate's records indicate that this amount was reflected in two separate invoices—the first in the amount of $126,924.00, and the second in the amount of $30,613.20.  The first invoice, bearing the invoice number JL12010, was entitled "Commercial Invoice" ("Commercial Invoice-2") and reflected an order of 31,731 pairs of girls' pants and shorts priced at $4 per unit.  The second invoice was entitled "Debit Note Samples" ("Sample Invoice-2") and indicated, falsely, that it reflected a shipment of 252 sample pieces ranging in unit price from $75 to $90 per piece.  Stargate declared only $126,924—*i.e.*, the value of Commercial-Invoice-2—as the value of the shipment to CBP.  Internally, however, Stargate used the "miscellaneous" column of its accounting system to add $0.85 per unit to the price of the girls'

pants and $1.00 per unit to the price of the girls' shorts, which when multiplied by the quantities reflected on Commercial Invoice-2 equaled the $30,613.20 that Stargate paid to Taizhou in Sample-Invoice-2.

30.     As a final example of this scheme, in late April 2014, Taizhou e-mailed two separate invoices, totaling $179,947.30, to employees of Stargate requesting payment for a shipment of ladies' and girls' woven pants and shorts that was expected to enter the United States in early May 2014.  One invoice entitled "Commercial Invoice" ("Commercial Invoice-3"), and bearing invoice number JL14010, was in the amount of $131,722.00 for 27,986 pieces priced between $4.50 and $5.00 per unit.  The second invoice entitled "Debit Note Samples" ("Sample Invoice-3"), in the amount of $48,225.30, indicated, falsely, that it reflected a shipment of 456 sample pieces priced between $75 and $95 per unit.  On or about April 29, 2014, Stargate wired $179,947.30 (the sum of the amounts listed in Commercial Invoice-3 and Sample Invoice-3) to Taizhou for this shipment.  However, when the goods entered the United States on or about May 5, 2014, Stargate submitted only Commercial Invoice-3 to CBP through its customs broker and falsely declared only $131,722 as the value of the shipment.

### ii.     Tex-Prime International, Ltd.

31.     Stargate also engaged in two very similar schemes with a Chinese company called Tex-Prime International, Ltd. and its affiliated companies ("Tex-Prime"), by which Stargate falsely underreported the value of merchandise it purchased from Tex-Prime and imported into the United States:

a.     A "double-invoicing" scheme involving two nearly identical invoices for each shipment differing only in price.  The first invoice, reflecting a higher price for each shipment, was the one that Stargate actually paid.  The second invoice, reflecting a lower price for the goods

(and frequently identified by a "C" suffix following the invoice number, or the term "Custom" following the invoice number in the file name), was the one that Stargate submitted to CBP.

  b. A scheme by which the true price paid for each shipment of clothing was split over two invoices, a "commercial invoice" and a "statement."  The "statement" purported to be an invoice for accessories charges, commissions, testing charges, or samples, but in reality showed an additional payment made by Stargate to Tex-Prime for the same shipment that was not disclosed to CBP.

  32. As an example of the double-invoicing scheme, in early January 2013, Stargate received an email from employees of Tex-Prime transmitting "shipping documents" for a shipment of children's swimwear, attaching an invoice dated December 27, 2012, bearing the number "TPV-120080C," in the amount of $80,255.00.  Stargate submitted this invoice to CBP as part of its entry package for this shipment.  However, Stargate's internal accounting check register reflects that it actually paid $84,283.16 for Invoice Number "TPV-120080" (without the "C" suffix).  The invoice with the "C" suffix that was submitted to CBP falsely understated the value of the goods imported into the United States.

  33. As a further example of the double-invoicing scheme, on or around December 17, 2013, Tex-Prime sent Stargate two versions of invoice TPV130128 for the same shipment of infants' clothes: an invoice in the amount of $120,695.20, which Stargate actually paid, and an invoice in the lesser amount of $114,892.32, which was the value declared to CBP.  The two invoices were otherwise almost identical, except that in the invoice submitted to CBP, the per-item cost of each item was approximately 5% lower than in the invoice that was actually paid (*e.g.*, polyester woven swimming trunks were declared at $2.65 per piece rather than the $2.78 per piece

that Stargate paid for them).  Stargate's internal accounting documents confirm that it paid the higher invoiced price for this shipment.

34.     As an example of the scheme involving an additional, undisclosed "statement" that reflected part of the price that Stargate paid for a shipment, Stargate received two separate invoices from Tex-Prime in connection with a shipment of infants' and girls' sleepwear shipped on May 31, 2011: (1) a Commercial Invoice bearing the invoice number TPV110030, dated May 26, 2011, in the amount of $42,267.00 for 12,900 pieces, and (2) a "Statement" dated June 1, 2011, in the amount of $21,092.10, for "Accessories Charges for 12,900 pics of Infants/Children sleepwear Ref. No. TPV110030" and "Commission for 12,900 pics of Infants/Children sleepwear Ref. No. TPV110030."  Stargate's internal accounting spreadsheets reflect that Stargate paid Tex-Prime the amounts listed on both of these invoices, and internally allocated the "accessories charges" and "commission" to each of the styles listed on the commercial invoice.  Charges for accessories and commission were part of the price paid for the merchandise and were subject to duty.  However, Stargate only presented the Commercial Invoice to CBP when these goods were entered into the United States, and therefore falsely declared the value of the goods to be $42,267.00.

    **b.  Rivstar**

35.     Beginning in or about 2009 and continuing through approximately 2016, Rivstar likewise fraudulently undervalued clothing that it imported from Chinese manufacturers into the United States, in order to evade customs duties.  Specifically, Rivstar's undervaluation scheme involved the creation of two sets of invoices per shipment—one that purported to describe the goods imported, and a second that on its face indicated that it was for "testing costs" relating to these goods, which are still subject to customs duties and which importers must declare to CBP. Together, the two invoices reflected the true price that Rivstar paid for the goods; Rivstar, however,

did not declare the amount reflected on the "testing costs" invoice to CBP.  In order to differentiate between the two invoices, the exporting entities used various numbering schemes involving suffixes added to the invoice numbers.

### i.       Pacific Potential

36.     One of the exporters that engaged in this scheme with Rivstar was Pacific Potential Trading Co., Ltd., which along with its affiliated entities (together, "Pacific Potential"), is a manufacturer located in China.  For example, on or about February 11, 2014, a Pacific Potential employee requested via email that Rivstar wire funds for four shipments of ladies' swimwear, specifying the following invoice numbers and amounts:

PPT/14/134: $208,217.55

PPT/14/135: $70,144.75

PPT/14/137: $474,973.60

PPT/14/138: $ 38,029.20

37.     In February 2014, Bailey authorized a wire transfer in the total amount of $791,365.10 for these invoices.  Rivstar's internal records reflect, however, that each of these invoices was in fact two separate invoices that together totaled each amount reflected in the email from Pacific Potential.  One invoice purported to describe the cost of the goods and hangers, and an accompanying invoice with the same invoice number (but appending the suffix "A") purported to be for "testing costs" associated with the goods:

PPT/14/134: $192,539.55

PPT/14/134A: $15,678.00

PPT/14/135: $65,322.50

PPT/14/135A: $4,822.25

PPT/14/137: $450,915.60

PPT/14/137A: $24,058.00

PPT/14/138: $35,191.20

PPT/14/138A: $2,838.00

TOTAL = $791,365.10

38.     When Rivstar entered the goods into the United States, it presented only the first invoice (*not* bearing the "A" suffix) associated with each shipment to CBP, and therefore did not accurately declare the value of the imported goods.  It fraudulently failed to declare $47,396.25 of the total amount it actually paid for these shipments (*i.e.*, the amount reflected in the "A" invoices).

39.     As another example of this scheme, in November 2014, Rivstar received two invoices for a shipment of girls' swimwear and shorts from Pacific Potential: the first (bearing the invoice number PPT/14/871) was in the amount of $273,949.77, and the second (bearing the invoice number PPT/14/871A) was in the amount of $15,309.75.  The invoice with the "A" suffix purported to be for "testing costs" of girls' swimwear.  Rivstar's internal accounting records reflect that it paid a total of $289,259.52 to Pacific Potential for this shipment.  Moreover, Rivstar's internal accounting records reflect the unit cost of each piece of clothing as the sum of the costs reflected on the two invoices.  However, Rivstar submitted only the PPT/14/871 invoice to CBP as part of the entry package submitted upon entry of the goods and falsely declared the "Total Entered Value" of the goods to be $273,950.  Thereby, fraudulently undervaluing the merchandise in this shipment by $15,309.

### ii.    Dongguan Bestsign Import & Export Company

40.     Another exporter that engaged in this scheme with Rivstar was Dongguan Bestsign Import & Export Company, which along with its affiliated entities (together, "Dongguan"), was

14

another clothing manufacturer located in China.  For example, on or about April 7, 2014, Rivstar

wired $229,653.60 to Dongguan as payment for four invoices—all of which bore the same invoice

number, but were differentiated with a letter suffix (A, B, C, D)—in the following amounts:

JP20140315A: $106,732.80

JP20140315B: $10,464.00

JP20140315C: $102,640.80

<u>JP20140315D: $9,816.00</u>

TOTAL = $229,653.60

Rivstar submitted only the A and C invoices to CBP when the merchandise was entered into the

United States and falsely declared the "Total Entered Value" of the shipments to be $106,733 and

$102,641, respectively.  The two invoices that were not declared to CBP—the "B" and "D"

invoices—purported to be for "testing costs" in the unit price of $0.25 per unit.  However, in its

internal accounting system, Rivstar recorded the unit price for the swimwear as the sum of all four

invoices (A-D), adding $0.25 per unit to each unit's value.  By failing to declare the amounts it

paid for the goods that were reflected on the "B" and "D" invoices to CBP, Rivstar falsely

undervalued the cost of the clothing it imported in these shipments.

### iii.     JP Sportswear, Inc.

41.     Finally, Rivstar also engaged in this fraudulent undervaluing scheme with a

company called JP Sportswear, Inc. ("JP Sportswear") with offices in Brooklyn, New York.  For

example, in November 2015, Rivstar paid $151,900.45 to JP Sportswear for a shipment of girls'

swimwear.  This amount was reflected in two separate invoices—one bearing invoice number

SL20151012-077A (the "A Invoice") in the amount of $141,788.20, and a second bearing invoice

number SL20151012-077B (the "B Invoice") in the amount of $10,112.25, which indicated that it

was for "testing costs" at $0.25 per unit.  In its internal accounting program, Rivstar included the additional $0.25 from the B Invoice in the unit price of the styles reflected on the A Invoice. However, in the entry package that it submitted to CBP through its customs broker, Rivstar presented only the A Invoice and falsely declared the "Total Entered Value" of the shipment to be $141,788.  Rivstar fraudulently undervalued the merchandise in this shipment by $10,112.25 (the B Invoice amount).

\* \* \*

42.    In connection with the schemes described above, Defendants submitted hundreds of fraudulent invoices to the Government.  These invoices undervalued the merchandise that Defendants entered into the United States by tens of millions of dollars.

43.    Defendants used these fraudulent invoices with the intention and expectation that the Government would reasonably rely on the deflated values stated on the fraudulent invoices.

44.    Defendants' fraudulent invoices and resulting entry summaries were material to the Government's assessment and collection of customs duties.

45.    By knowingly submitting the fraudulent invoices to CBP, and by not disclosing the amounts Defendants actually paid for the shipments, Defendants paid less than the amount of customs duties actually owed to the Government.  In total, the Government estimates that Defendants underpaid customs duties by millions of dollars pursuant to these fraudulent schemes.

### CLAIM FOR RELIEF

Violation of the False Claims Act
31 U.S.C. § 3729(a)(7) (until May 20, 2009), and
as amended, 31 U.S.C. § 3729(a)(1)(G) (after May 20, 2009)
Reverse False Claims

46.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

47.     The Government seeks relief against Defendants under Section 3729(a)(7)  of the False Claims Act, 31 U.S.C. § 3729(a)(7) (until May 20, 2009), and, as amended, Section 3729(a)(l)(G) of the False Claims Act, 31 U.S.C. § 3729(a)(l)(G) (after May 20, 2009).

48.     As set forth above, Defendants knowingly made, used, or caused to be made or used false records and/or statements to conceal, avoid, or decrease obligations to pay or transmit money or property, in the form of customs duties, to the United States.

49.     The Government incurred losses in the form of customs duties underpaid by Defendants because of their wrongful and fraudulent conduct.

50.     By virtue of the false records or statements made by Defendants, the Government suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, and a civil penalty as required by law for each violation.

* * *

WHEREFORE, the Government respectfully requests that judgment be entered in its favor and against Defendants as follows:

1.     Treble the Government's damages on each count in an amount to be determined at trial, such civil penalties as are required by law, and an award of costs pursuant to 31 U.S.C. § 3729(a); and

2.     Such further relief as is proper.

Dated:   New York, New York
         April 19, 2019

                         Respectfully submitted,

                         GEOFFREY S. BERMAN
                         United States Attorney for the
                         Southern District of New York
                         *Attorney for the United States of America*

By:     _____
                         DOMINIKA TARCZYNSKA
                         JEAN-DAVID BARNEA
                         Assistant United States Attorneys
                         86 Chambers Street, 3rd Floor
                         New York, New York 10007
                         Tel:  (212) 637-2748/2679
                         Fax:  (212) 637-2686
                         dominika.tarczynska@usdoj.gov
                         jean-david.barnea@usdoj.gov